1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

11  CHRISTOPHER CALKINS,                    ) Case No.  EDCV 13-1761-DOC (DTB)
                                            )
12                      Petitioner,         )
                                            )
13              vs.                         ) REPORT AND RECOMMENDATION
                                            ) OF UNITED STATES MAGISTRATE
14  J. SOTO,                                ) JUDGE
                                            )
15                      Respondent.         )
                                            )
16  ─────────────────────────────────      )

17          This Report and Recommendation is submitted to the Honorable David O.

18  Carter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636

19  and General Order 05-07 of the United States District Court for the Central District

20  of California.

21

22                              **PROCEEDINGS**

23          On September 27, 2013, petitioner filed a Petition for Writ of Habeas Corpus

24  by a Person in State Custody ("Pet.") herein, together with supporting attachments

25  ("Pet. Att.")[1] and exhibits ("Pet. Exh.").   In accordance with the Court's Order

26  ─────────────────────

27          [1]      The Court has consecutively numbered each of petitioner's attachments

28                                                                        (continued...)

1

Requiring Response to Petition, respondent filed an Answer to Petition for Writ of Habeas Corpus ("Ans.") on November 15, 2013.  On December 19, 2013, petitioner filed his Traverse ("Trav.") thereto.

Thus, this matter is now ready for decision.  For the reasons discussed hereafter, the Court recommends that the Petition be denied.

## PROCEDURAL HISTORY

On February 3, 2011, a San Bernardino County Superior Court jury found petitioner guilty of two counts of second degree robbery, attempted second degree robbery, shooting at an occupied vehicle, two counts of assault with a firearm, and assault likely to produce great bodily injury.  The jury also found true the allegations that petitioner personally used a firearm, that petitioner personally and intentionally discharged a firearm, and that petitioner personally inflicted great bodily injury. (Clerk's Transcript on Appeal ["CT"] 120-38.)  On May 9, 2011, the trial court sentenced petitioner to state prison for a total term of 34 years 8 months. (Supplemental Clerk's Transcript on Appeal 1-3.)

Petitioner appealed his conviction and sentence to the California Court of Appeal raising a claim corresponding to the single claim raised herein. (Respondent's Notice of Lodging ["Lodgment"] No. 5.)  In an unpublished decision issued on July 11, 2012, the court of appeal affirmed the judgment.  (Lodgment No. 8.)  Petitioner's ensuing Petition for Review to the California Supreme Court raising the same claim was summarily denied without comment or citation to authority on September 19, 2012.  (Lodgment Nos. 9, 10.)

Thereafter, petitioner sought to collaterally attack his conviction, filing a habeas petition in the San Bernardino County Superior Court on August 12, 2013.

---

[1](...continued)
for ease of reference.

2

1  (Lodgment No. 11.)  That petition was denied on November 1, 2013.  (Lodgment No.
2  12.)

3

4                **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

5          Since petitioner is challenging the sufficiency of the evidence to support his

6  conviction, the Court has independently reviewed the state court record.  See Jones

7  v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).[2]  Based on its review, the Court adopts

8  the following summary from the "Factual Background" section of the California

9  Court of Appeal opinion as a fair and accurate summary of the evidence presented at

10  trial (Lodgment No. 8 at 3-9 (footnote omitted)):

11          *A.  People's Case-in-Chief  [¶]  1.  July 26, 2009, incident  [¶]*

12          *Juan Silva met Christina Aquino on the Internet.  Prior to July 26, 2009,*

13          *he and Christina had "spen[t] time" together.  On July 26, Christina set*

14          *up another date and told Silva to pick her up at 2505 Kendall Way in*

15          *San Bernardino.  Silva went to the location around 11:00 p.m.  He*

16          *texted Christina that he had arrived and got out of his car.  As soon as*

17          *Silva got out of his car, he was approached by [petitioner], who was*

18          *dressed in baggy jeans and a dark hooded sweater or "hoodie."  Silva*

19          *could not tell if [petitioner] had long hair pulled back in a ponytail*

20  _____

21          [2]      The Court has independently reviewed the record out of an abundance
22  of caution in light of Jones notwithstanding Ninth Circuit cases that have accorded
    the factual summary set forth in an opinion of a state court a presumption of
23  correctness pursuant to 28 U.S.C. § 2254(e)(1).  See Slovik v. Yates, 556 F.3d 747,
    749 n.1 (9th Cir. 2009) (as amended); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th
24  Cir. 2009) (as amended); Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008);
25  Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008).  Petitioner has the burden
    of rebutting the presumption of correctness by clear and convincing evidence.  Here,
26  petitioner does not contest the California Court of Appeal's summary of the
    underlying facts, nor has he attempted to overcome the presumption of correctness
27  accorded to it.  Tilcock, 538 F.3d at 1141.
28

                                            3

*because the hood covered his hair.  Despite the hood of the sweater being over [petitioner's] head, Silva could see his face.   [¶] [Petitioner] put a shotgun in Silva's face.  The shotgun touched Silva's right cheek.  [Petitioner] demanded that Silva give him his wallet and cellular telephone.  Silva also gave [petitioner] a portable gaming device that he had in this car.  [¶]  [Petitioner] then told Silva to get in his car and drive away.  Silva complied.  He was afraid and did not know where a police station was located in San Bernardino.  He drove home to Victorville and then called the police.  Silva reported the incident over the phone to someone at the San Bernardino Police Department and described his assailant as a Hispanic male, about 23 years of age and 210 pounds.  He thought the assailant had a shaved head.  [¶]  San Bernardino Police Sergeant Brian Harris prepared several six-pack photographic lineups that were shown to Silva.  Silva was admonished prior to viewing them that he did not have to choose someone.  He chose [petitioner's] photograph.  He also identified Christina from a photographic lineup.  After he was robbed, Silva never heard from Christina again.  Even that night, Christina never texted him to find out what had happened to him.  Silva identified a shotgun in court as the one that was put in his face (exhibit 35).  [¶]  2.  August 8, 2009, incident  [¶]  Ricardo Carrillo had met a woman by the name of Christina on an Internet site prior to August 8, 2009.  On August 8, 2009, Christina told Carrillo to come to 2505 Kendall Way in San Bernardino so they could barbecue and watch movies.  When Carrillo arrived around 10:30 p.m., he called Christina and told her that he was there.  She told him that she was not fully dressed and to wait outside. Carrillo sat in his truck.  While he was waiting, a man came to the driver's side window of the truck and banged on it with a shotgun.  He*

told Carrillo (in Spanish) to roll down the window.  [¶]  The man wore a black sweater with a hood on it that was pulled up over his head. Rather than roll down his window, Carrillo crouched down in his seat and began driving away.  As Carrillo drove, the man fired two shots at the truck.  One of the bullets hit the driver's side windshield.  Another bullet hit the driver's side door. Carrillo drove off quickly and stopped at a nearby store.  [¶]  Carrillo called the police on his way to the store, and they were waiting for him at the store when he arrived.  Carrillo was bleeding from his neck and had glass "all over [his] side."  A shotgun cap was found inside Carrillo's truck.  Carrillo was taken to the hospital, where he was treated for numerous cuts from the glass.  At the time of trial,  Carrillo still had glass fragments and shotgun pellets in his skin.  He never again heard from Christina.  He described the shooter as a Hispanic male but only because he spoke Spanish to him. It was too dark to see his face.  [¶]  Carrillo first stated that exhibit 35 was not the shotgun used to bang on his window.  Carrillo explained that the bottom part of the shotgun, the grip, was different.  Carrillo admitted that he was assuming the grip on the shotgun he saw that night was wood, but he was not absolutely sure.  Carrillo also indicated that the shotgun grip that was at his window was more "triangular."  He could not accurately see the color of the shotgun through his tinted windows.  [¶]  Two shotgun shells were found at the Kendall Way location.  The shotgun shells were Federal brand ammunition.  [¶]  3. August 10, 2009, incident  [¶]  Richard Cordova met a girl named Christina in an Internet chat room.  Cordova and Christina agreed to meet.  Christina first sent Cordova a text message to meet her at a residential address in San Bernardino but then changed the address to an apartment complex in San Bernardino.  Christina set up a meeting

*time for 10:00 p.m., which Cordova thought was late for a first date. Christina had not given him a specific apartment number to go to.  [¶] When Cordova arrived at the apartment complex, he texted Christina. She directed him to park in a red zone in front of the apartment; he ended up parking on a side street near the complex.  Cordova sat in his car and drank two or three beers.  Cordova then walked to the front gate of the apartment complex.  He carried a backpack, a 12-pack of beer, and two cellular telephones.  When he walked to the gate, [petitioner] was near the gate wearing black sweats and a black hooded sweatshirt.  [¶]  Cordova heard the cocking of a shotgun, and [petitioner] grabbed him by his shirt.  [Petitioner] grabbed the backpack and took the cellular telephone Cordova had clipped to his waist and Cordova's keys and threw them to the ground.  [Petitioner] then asked for Cordova's wallet.  Cordova feared for his life and grabbed for the shotgun.  Cordova pulled on the trigger to try to jam the shotgun with a shell but it did not work.  He then pulled on the trigger two times in order to try to get help.  He was able to wrestle the shotgun to the ground and lay on top of it.  [¶]  [Petitioner] grabbed the 12-pack of beer and smashed them on the ground.  He "pushed" broken glass into Cordova's head.  He also hit Cordova over the head with a beer bottle.  He then punched Cordova on both sides of his face. Cordova was able to get up off the ground.  He fell again and cut his forearm on the glass from the broken bottles, requiring seven staples. In addition, he cut his shin, which required three staples, and he had to have seven staples for the cut on his head.  [¶]  At some point, [petitioner] ran off.  Cordova ran toward the apartment complex with the shotgun.  Security at the apartment complex came to help him.  [¶] When the police arrived, Cordova was in pain and disoriented.  He*

made a brief statement to officers at the apartment complex. He described [petitioner] as Hispanic, around 21 years of age, approximately five feet seven inches tall with short dark hair. Cordova was kept over night at the hospital and was taking painkillers. At the hospital, he described [petitioner] as 21 to 25 years of age, five feet seven to five feet nine inches tall, weighing between 190 and 200 pounds. Christina never contacted Cordova again. [¶] Two shotgun shells and an end cap from the shotgun shell were found at the scene where Cordova and [petitioner] struggled over the shotgun. The shotgun shells were Federal brand. There was broken glass in the area. [¶] Cordova was shown several photographic lineups. On a final lineup shown to him, he identified [petitioner]. In previous photographic lineups, he was unable to identify anyone. Cordova indicated that the night of the incident, [petitioner's] hair was shorter than in the photographs. Cordova was taking Vicodin for pain at the time of the lineups. He identified exhibit 35 as the shotgun he took from [petitioner]. [¶] 4. <u>Further investigation</u> [¶] The shotgun shells found at the Carrillo and Cordova scenes were compared. They all were Federal brand ammunition. They all had identical markings and were the same type of ammunition. [¶] The serial number on the recovered shotgun had been removed. It was a 12-gauge shotgun, and all of the ammunition recovered was for a 12-gauge shotgun. The gun was never test fired to match the shotgun shells. [¶] Detective Harris contacted Nancy Ranyak-Henry on October 14, 2009. Ranyak-Henry advised him that she let [petitioner] stay with her in May 2009 because he needed a place to live. She told Detective Harris that a woman named Christina Aquino would come and stay with [petitioner] at the house. Ranyak-Henry eventually asked [petitioner] to leave. She told

*Detective Harris that approximately one week prior to the detective contacting her, [petitioner] had called her. He advised her that he had been arrested for committing multiple robberies and wanted her to be his alibi. [Petitioner] told her he needed an alibi for July 26, August 8, and August 10. She told [petitioner] she did not want to be involved and wanted nothing to do with him. She also told Detective Harris that [petitioner] had called her in June 2009 asking if she wanted to buy a shotgun. [¶] At trial, Ranyak-Henry denied she ever spoke with Detective Harris. She denied that [petitioner] ever asked her to be his alibi or asked her to buy a shotgun from him. She claimed to have brain damage. She denied knowing Christina Aquino. Detective Harris entered the courtroom, and she denied she had ever seen him before. [¶] Ranyak-Henry's testimony at a prior hearing was read to the jury. She recalled talking to an officer in October 2009 but could not recall his name. [Petitioner] had asked her about the three dates, not because of an alibi, but so he could put it on his time sheet to show he was taking care of her at that time. [Petitioner] took care of her because she had brain damage. She did recall [petitioner] mentioning he knew someone who wanted to sell a shotgun. [¶] Detective Harris indicated that [petitioner's] hair was much shorter at the time he was arrested than it was at trial. [Petitioner] was approximately six feet tall. [¶] B. Defense [¶] Silva had described his assailant to another San Bernardino police officer as approximately five feet ten inches tall, 210 pounds, clean shaven, and with a shaved head or short hair. Silva stated immediately after the robbery that he would not be able to identify the suspect if he saw him again.*

/ / /

/ / /

## PETITIONER'S CLAIM HEREIN

There was insufficient evidence to support the convictions on counts two, three, and four in violation of the Due Process Clause.  (Pet. at 5.)

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see also Howes v. Fields, 565 U.S. –, 132 S. Ct. 1181, 1187, 182 L. Ed. 2d 17 (2012); Greene v. Fisher, 565 U.S. –, 132 S. Ct. 38, 44, 181 L. Ed. 2d 336 (2011); Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

Although a particular state court decision may be "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings.  Williams, 529 U.S. at 391, 413.  A state court decision is

9

"contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam); Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Packer, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts.'" Packer, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Visciotti, 537 U.S. at 24-27; Williams, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. See Williams, 529 U.S. at 409-11; see also Visciotti, 537 U.S. at 25; Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). "To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond

10

1   any possibility for fairminded disagreement.'" <u>Metrish v. Lancaster</u>, 569 U.S. –, 133

2   S. Ct. 1781, 1786-87, 185 L. Ed. 2d 988 (2013) (quoting <u>Harrington v. Richter</u>, 562

3   U.S. –, 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011)).  Moreover, as the Supreme

4   Court recently held in <u>Cullen v. Pinholster</u>, 563 U.S. –, 131 S. Ct. 1388, 1398, 179

5   L. Ed. 2d 557 (2011), review of state court decisions under § 2254(d)(1) "is limited

6   to the record that was before the state court that adjudicated the claim on the merits."

7       In <u>Richter</u>, 131 S. Ct. at 784-85, the Supreme Court held that a summary denial

8   order will be presumed to be a merits determination "in the absence of any indication

9   or state-law procedural principles to the contrary."  The Supreme Court further held

10  that the AEDPA standard of review applies to such summary denial orders.  <u>See</u> <u>id.</u>

11  at 784 ("Where a state court's decision is unaccompanied by an explanation, the

12  habeas petitioner's burden still must be met by showing there was no reasonable basis

13  for the state court to deny relief.  This is so whether or not the state court reveals

14  which of the elements in a multipart claim it found insufficient, for § 2254(d) applies

15  when a 'claim,' not a component of one, has been adjudicated.").

16

17                              **DISCUSSION**

18  **I.   Petitioner is not entitled to habeas relief on his insufficiency of the**

19       **evidence claim.**

20       Petitioner contends that there was insufficient evidence to support his

21  convictions on counts two (attempted second degree robbery), three (shooting at an

22  occupied vehicle), and four (assault with a firearm).  (Pet. at 5.)  Petitioner vaguely

23  argues that "there was no evidence to support a conviction"; "[a]ll elements were not

24  proved"; and "[i]dentification of [p]etitioner was not proven for the counts."  (<u>Id.</u>)

25  As best the Court can glean, petitioner is maintaining that the evidence was

26  insufficient to prove he was the perpetrator of the attempted robbery on Ricardo

27  Carrillo ("Carrillo") on August 8, 2009.  (<u>Id.</u>; Pet. Att. 4 at 13.)  According to

28  petitioner, the only evidence connecting him to the August 8, 2009 attempted robbery

was the similarity of the modus operandi to two other robberies committed on July 26, 2009 and August 10, 2009, which petitioner maintains is insufficient to prove petitioner committed the August 8, 2009 offenses as it did not exclude the possibility that someone other than petitioner committed the attempted robbery and "the strength of the inference that it was [petitioner] who committed all of the robberies was substantially weakened by the fact that the inference relied on the conduct of [Christina] Aquino and not [petitioner]." (Pet. Att. 4 at 13, 16-17.)

A.    The California Court of Appeal decision[3]

In rejecting the corresponding claim on direct appeal, the California Court of Appeal reasoned, in pertinent part, as follows (Lodgment No. 8 at 10-13 (footnotes omitted)):

> "Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the

---

[3]    See Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); see also Johnson v. Williams, 568 U.S. –, 133 S. Ct. 1088, 1094 n.1, 185 L. Ed. 2d 105 (2013) (noting that the Ninth Circuit, consistent with Ylst, "look[ed] through" the California Supreme Court's summary denial of a petition for review and examined the court of appeal's opinion).

*other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" [Citation.]" (People v. Cravens (2012) 53 Cal.4th 500, 507-508.) [¶] "Defendant's hurdle to secure a reversal is just as high even when the prosecution's case depends on circumstantial evidence." (People v. Akins (1997) 56 Cal.App.4th 331, 336 [Fourth Dist., Div. Two].) A similar modus operandi in separate crimes can provide sufficient circumstantial evidence to support a conviction. (Id. at p. 337.) [¶] Here, in the first robbery, Silva met Christina Aquino over the Internet and she directed him to a home on Kendall Way. Once there, Silva was approached by [petitioner], whom he clearly identified both from a six-pack photographic lineup and in court, who held a shotgun to his face. [Petitioner] was wearing a dark hooded sweater and took Silva's money and wallet. [¶] In the third robbery against Cordova, where [petitioner] was again identified as the perpetrator, Cordova met a girl named Christina over the Internet who directed him to an apartment complex within a short distance of the Kendall Way house. One can reasonably surmise that Christina and [petitioner] were nervous about committing another robbery at the Kendall Way address. Once there, Cordova was approached by [petitioner], who again was wearing a black hooded sweatshirt and was armed with a shotgun. After the encounter, Federal brand shotgun shells were found*

13

*at the scene. [¶] [Petitioner] was not identified by Carrillo, the victim in counts 2, 3, and 4. However, the modus operandi was almost identical to the other robberies. Carrillo was at the Kendall Way address to meet Christina, whom he had met over the Internet. Once he arrived, Carrillo was approached by a Hispanic male in a black hooded sweater armed with a shotgun. Carrillo drove off, but not before he was shot at two times. The shotgun shells found after the incident with Carrillo were identical to the ones that were later found at the Cordova scene. Although Carrillo could not identify the shotgun, he explained he could not see the entire shotgun and that it was dark. [¶] In addition to the similarity of the crimes, the jury could reasonably rely upon Detective Harris's testimony that Ranyak-Henry told him that [petitioner] had been with Christina around the time the crimes were committed. Further, the jury could also believe that [petitioner] contacted Ranyak-Henry and asked her to provide him an alibi for all three dates that the offenses were committed. This clearly showed [petitioner's] consciousness of guilt. [¶] When viewing the circumstantial evidence tying [petitioner] to the Carrillo robbery in the light most favorable to the People, it is clear that the jury reasonably could have concluded that [petitioner] was the perpetrator of all three offenses, including the attempted robbery, shooting at an occupied vehicle, and assault with a firearm against Carrillo. [¶] [Petitioner] refers to Evidence Code section 1101, subdivision (b) to support his claim that the three incidents were not similar enough to show his identity. However, that section has no applicability here. The modus operandi here was relevant to show circumstantial evidence to support that [petitioner] committed all of the offenses. We reject [petitioner's] claim. The verdict is supported by substantial evidence.*

14

1
B.    <u>Applicable legal authority</u>

2      The California standard for determining the sufficiency of the evidence to

3 support a conviction has been held by the California Supreme Court to be identical

4 to the federal standard enunciated by the United States Supreme Court in <u>Jackson v.</u>

5 <u>Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  <u>See</u> <u>People v.</u>

6 <u>Johnson</u>, 26 Cal. 3d 557, 576, 162 Cal. Rptr. 431 (1980).  Under this standard, the

7 question is "whether, after viewing the evidence in the light most favorable to the

8 prosecution, <u>any</u> rational trier of fact could have found the essential elements of the

9 crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (emphasis in original);

10 <u>see</u> <u>also</u> <u>Parker v. Matthews</u>, 567 U.S. –, 132 S. Ct. 2148, 2152, 183 L. Ed. 2d 32

11 (2012) (per curiam).  In making this determination, the reviewing court "must respect

12 the province of the jury to determine the credibility of witnesses, resolve evidentiary

13 conflicts, and draw reasonable inferences from proven facts by assuming that the jury

14 resolved all conflicts in a manner that supports the verdict." <u>Walters v. Maass</u>, 45

15 F.3d 1355, 1358 (9th Cir. 1995); <u>see</u> <u>also</u> <u>Cavazos v. Smith</u>, 565 U.S. –, 132 S. Ct. 2,

16 6, 181 L. Ed. 2d 311 (2011) (per curiam) (<u>Jackson</u> "instructs that a reviewing court

17 'faced with a record of historical facts that support conflicting inferences must

18 presume – even if it does not affirmatively appear in the record – that the trier of fact

19 resolved any such conflicts in favor of the prosecution, and must defer to that

20 resolution.'" (quoting <u>Jackson</u>, 443 U.S. at 326)).  Further, the AEDPA requires an

21 additional degree of deference to a state court's resolution of an insufficiency of the

22 evidence claim.  <u>See</u> <u>Coleman v. Johnson</u>, 566 U.S. –, 132 S. Ct. 2060, 2062, 182 L.

23 Ed. 2d 978 (2012) (per curiam) ("<u>Jackson</u> claims face a high bar in federal habeas

24 proceedings because they are subject to two layers of judicial deference.").

25 Consequently, habeas relief is not warranted unless "the state court's application of

26 the <u>Jackson</u> standard [was] 'objectively unreasonable.'" <u>Juan H. v. Allen</u>, 408 F.3d

27 1262, 1275 n.13 (9th Cir. 2005) (as amended); <u>see</u> <u>also</u> <u>Coleman</u>, 132 S. Ct. at 2062;

28 <u>Smith</u>, 132 S. Ct. at 4.  Finally, "the standard must be applied with explicit reference

1  to the substantive elements of the criminal offense as defined by state law." Jackson,

2  443 U.S. at 324 n.16; Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).

3

4       C.    Analysis

5       As explained above, petitioner contends that the evidence was insufficient to

6  support the finding that he attempted to rob Carrillo. Petitioner's challenge is focused

7  on the circumstantial nature of the evidence introduced at trial linking him to the

8  attempted robbery on August 8, 2009 based on the same modus operandi as that used

9  during the robberies on July 26, 2009 and August 10, 2009.    However,

10  "circumstantial evidence alone can be sufficient to demonstrate a defendant's guilt,"

11  United States v. Cordova Barajas, 360 F.3d 1037, 1041 (9th Cir. 2004); see also

12  United States v. Yoshida, 303 F.3d 1145, 1151 (9th Cir. 2002); United States v.

13  Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992) (as amended), and jurors may

14  draw an "inference upon an inference." United States v. Arteaga, 117 F.3d 388, 399

15  (9th Cir. 1997) (as amended) (citation omitted). As the Ninth Circuit has explained,

16  "[c]ircumstantial evidence and reasonable inferences drawn from it may properly

17  form the basis of a conviction." Schad v. Ryan, 671 F.3d 708, 717 (9th Cir. 2011) (as

18  amended).

19       Here, viewing the evidence presented at trial in the light most favorable to the

20  prosecution, the Court concludes that there was substantial circumstantial evidence

21  to support the convictions for the August 8, 2009 offenses of attempted second degree

22  robbery, shooting at an occupied vehicle, and assault with a firearm. The evidence

23  presented at trial established that on the evening of August 8, 2009, Carrillo went to

24  an address on Kendall Way to meet a woman named "Christina," whom he had met

25  on an internet chat line. (1 RT 43-44.) Christina had given Carrillo the address on

26  Kendall Way. (1 RT 44.) When Carrillo arrived at the location, he called Christina,

27  who told him that she was not ready and to wait outside. (1 RT 45-46.) A Hispanic

28  man, dressed in a black hooded sweater then approached Carrillo's truck, banged on

16

1   the window with a shotgun, and told him to roll down the window, in Spanish. (1 RT
2   46-48.) At that point, Carrillo crouched forward, started his truck, and began driving
3   away. As he did so, the suspect shot at Carrillo's vehicle twice, injuring Carrillo. (1
4   RT 48-52, 62.) After that incident, Carrillo never heard from Christina again. (1 RT
5   53.)

6       The modus operandi of the August 8, 2009 attempted robbery was strikingly
7   similar to two other robberies in which petitioner was identified as the perpetrator.
8   In the first robbery, Juan Silva ("Silva") met a woman named "Christina Aquino"
9   ("Aquino") through an online chat room. (1 RT 15-16.) They then made plans to go
10  out on July 26, 2009, and Aquino directed Silva to meet her at the same Kendall Way
11  address, late in the evening. (1 RT 16-17.) Aquino was not outside when Silva
12  arrived, so he texted her. (1 RT 18.) Less than a minute later, petitioner approached
13  Silva, and pointed a shotgun in his face. (1 RT 18-21, 26, 31-32.) Silva described
14  petitioner as a Hispanic man, wearing a dark hooded sweater. (1 RT 19, 23, 28.)
15  Petitioner took Silva's cell phone, wallet, and a video game device and then told him
16  to leave. (1 RT 21-22.) Like the August 8, 2009 incident, Silva did not hear from
17  Aquino again. (1 RT 26.)

18      A similar robbery also occurred on August 10, 2009. Again, the victim,
19  Richard Cordova ("Cordova"), met a woman named "Christina" on an internet chat
20  line, and they made plans to meet in the evening. (1 RT 64, 66.) Christina provided
21  the address and again, when Cordova arrived, Christina was not outside. (See 1 RT
22  65-67.) While Cordova was waiting for Christina, petitioner approached him, cocked
23  a shotgun, and grabbed Cordova's shirt, spinning him around. (1 RT 69-70, 87-88.)
24  Petitioner was described by Cordova as a Hispanic man, wearing a black hooded
25  sweater or sweatshirt. (1 RT 69, 77, 92, 95-96.) Petitioner grabbed Cordova's cell
26  phone and car keys, threw them to the side, and demanded Cordova's wallet. (1 RT
27  72.) At that point, Cordova began fighting back, and eventually gained control of the
28  shotgun. Thereafter, petitioner ran off. During the struggle, Cordova fired off two

17

1    shots from the shotgun. (1 RT 72-74.)  After this incident, Christina never contacted
2    Cordova again.  (1 RT 89.)

3        As the court of appeal correctly held, "the modus operandi was almost identical
4    to the other robberies" and "[t]he modus operandi here was relevant to show
5    circumstantial evidence to support that [petitioner] committed all of the offenses."
6    (Lodgment No. 8 at 11, 13.)

7        In addition, evidence was presented that the shotgun shell cases recovered from
8    the August 10, 2009 robbery, were the same brand and had identical markings as the
9    shotgun shell cases recovered from the August 8, 2009 attempted robbery.  (1 RT
10   116, 133-38.) Although petitioner contends that during trial, Carrillo testified that the
11   shotgun recovered from the August 10, 2009 robbery was different (Trav. at 3),
12   testimony was also introduced that it was "fairly easy" to change the grips on
13   shotguns, especially on the one recovered from the August 10, 2009 robbery (1 RT
14   139-40), which would reasonably explain why the shotgun used during the August
15   8, 2009 attempted robbery may have looked different.

16       Evidence also was presented that petitioner had been staying off and on with
17   Nancy Ranyak-Henry ("Ranyak-Henry") (1 RT 159-60, 164,  234), and that both
18   Aquino and petitioner had stayed at Ranyak-Henry's house.  (1 RT 178.)  Shortly
19   before the first robbery, petitioner tried to sell a Mossberg shotgun, the same brand
20   as the shotgun recovered at the August 10, 2009 robbery scene, to Ranyak-Henry.  (1
21   RT 116-17, 137, 179.)  After his arrest, petitioner called Ranyak-Henry and told her
22   that he had been arrested for multiple robberies and requested that she be his alibi for
23   July 26, 2009, August 8, 2009, and August 10, 2009.  (1 RT 177-79.)[4]

24   _____

25       [4]    Although Ranyak-Henry recanted many of her earlier statements at trial,
26   it was within the province of the jury to determine the credibility of witnesses and
27   resolve evidentiary conflicts.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir.
     1997); see also Smith, 132 S. Ct. at 6 (Jackson "unambiguously instructs that a
28                                                              (continued...)

1    Based on the foregoing, a rational jury could have found beyond a reasonable
2    doubt that petitioner committed all three crimes on August 8, 2014: Attempted
3    robbery, shooting at an occupied vehicle, and assault with a firearm.  See United
4    States v. Momeni, 991 F.2d 493, 494 (9th Cir. 1993) (per curiam) (holding that
5    "signature" evidence showing common characteristics among separate crimes "may
6    be sufficient alone to establish a perpetrator's identity"); People v. Akins, 56 Cal.
7    App. 4th 331, 336-37, 65 Cal. Rptr. 2d 338 (1997) (holding similar modus operandi
8    of two robberies supported the finding that defendant participated in both crimes).
9    Petitioner's attempt to re-argue the evidence adduced at trial does not alter this
10   conclusion.  As explained, a reviewing court must respect the province of the jury to
11   determine the credibility of witnesses, resolve evidentiary conflicts, and draw
12   reasonable inferences from proven facts by assuming that the jury resolved all
13   conflicts in a manner that supports the verdict.  See Walters, 45 F.3d at 1358; see also
14   Smith, 132 S. Ct. at 6.  As such, the Court cannot revisit these findings.

15   Accordingly, the Court concludes that the state courts' rejection of this claim
16   was neither contrary to, nor an unreasonable application of, the Jackson standard.
17   Petitioner is not entitled to habeas relief on his insufficiency of the evidence claim.

18

19   **II.    Petitioner is not entitled to an evidentiary hearing.**

20   Petitioner also appears to be requesting an evidentiary hearing.  (Trav. at 1-2.)
21   However, in Pinholster, the Supreme Court held that the AEDPA requires federal
22   courts to evaluate the reasonableness of state court decisions on the basis of the
23   record before the state court.  131 S. Ct. at 1398-1401.  The Supreme Court reasoned

24   _____

25       [4](...continued)
26   reviewing court 'faced with a record of historical facts that supports conflicting
     inferences must presume – even if it does not affirmatively appear in the record – that
27   the trier of fact resolved any such conflicts in favor of the prosecution, and must defer
28   to that resolution.'" (citation omitted)).

that the "backward-looking language" of Section 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and thus, the record under review must be "limited to the record in existence at that same time *i.e.*, the record before the state court." Id. at 1398. Accordingly, under <u>Pinholster</u>, petitioner is not entitled to an evidentiary hearing.

Further, an evidentiary hearing is not warranted where, as here, "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); <u>see also</u> <u>Pinholster</u>, 131 S. Ct. at 1399 (citing <u>Schriro</u> with approval); <u>Estrada v. Scribner</u>, 512 F.3d 1227, 1235 (9th Cir. 2008) ("[A] federal court must consider whether such a[n] [evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.") (citation omitted, alterations in original); <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998). Therefore, petitioner's request for an evidentiary hearing should be denied.

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) Approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: March 21, 2014

THE HONORABLE DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

20

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file Objections as provided in the Local Rules and review by the District Judge whose initials appear in the docket number. No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.